| | | |
|---|---|---|
| ANDREW GENTILE, CHRISTINE | ) | |
| GENTILE, and REDGATOR PAWN | ) | |
| SHOP, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| BRUNSWICK COUNTY SHERIFF'S | ) | |
| DEPARTMENT, JOHN INGRAM, | ) | |
| *in his individual and official capacity as* | ) | |
| *Sheriff of Brunswick County*, RYAN | ) | |
| NEWMAN, *in his individual and official* | ) | |
| *capacity as a Detective for the Brunswick* | ) | |
| *County Sheriff's Department*, MICHAEL | ) | |
| MURRAY, *in his individual and official* | ) | |
| *capacity as a Detective for the Brunswick* | ) | |
| *County Sheriff's Department*, | ) | |
| BRUNSWICK COUNTY, WESTERN | ) | |
| SURETY COMPANY, BRUNSWICK | ) | |
| COUNTY DISTRICT ATTORNEY'S | ) | |
| OFFICE, and MEREDITH EVERHART, | ) | |
| *in her individual and official capacity as* | ) | |
| *an Assistant District Attorney with the* | ) | |
| *Brunswick County District Attorney's* | ) | |
| *Office*, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the following motions: (1) a motion to dismiss, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, by Defendants Brunswick County District Attorney's Office (the "District Attorney's Office") and Meredith Everhart ("Everhart") [DE-15], to which Plaintiffs, Andrew Gentile, Christine "Chrissy" Gentile, and Redgator Pawn Shop (collectively, "Plaintiffs"), filed a response in opposition [DE-33], the District

Attorney's Office and Everhart filed a reply [DE-34], Plaintiffs filed a surreply [DE-56] with leave of court, and the District Attorney's Office and Everhart filed a reply to surreply [DE-57] without leave of court; (2) a motion to dismiss, pursuant to Rule 12(b)(6), by Defendants Brunswick County Sheriff's Department (the "Sheriff's Department") and Brunswick County (the "County") [DE-20], to which Plaintiffs filed a response in opposition [DE-40], and the Sheriff's Department and the County filed a reply [DE-42]; and (3) a motion to dismiss, pursuant to Rule 12(b)(6), by Defendants John Ingram ("Ingram"), Michael Murray ("Murray"), and Ryan Newman ("Newman") [DE-37], to which Plaintiffs filed a response in opposition [DE-50], and both the District Attorney's Office and Everhart [DE-51] and Ingram, Murray, and Newman [DE-52] filed replies. All briefing is complete and the motions are ripe for disposition. The parties have not consented to the jurisdiction of the magistrate judge; therefore, Defendants' motions to dismiss are considered here as a recommendation to the District Court. *See* 28 U.S.C. § 636(b)(1)(B); *see also* Local Civil Rule 72.3(c). For the reasons more fully set forth below, it is recommended that the motion to dismiss by the District Attorney's Office and Everhart be granted, the motion to dismiss by the Sheriff's Office and the County be granted, and the motion to dismiss by Ingram, Murray, and Newman be granted.

## I. PROCEDURAL BACKGROUND

Plaintiffs filed this action in Brunswick County Superior Court and the matter was removed to this court on April 25, 2013. [DE-1]. In addition to the movants listed above, Western Surety Company is also a Defendant in this matter "as the surety on Defendant John Ingram's official sheriff bond pursuant to N.C. Gen. Stat. § 58-76-5." Compl. [DE-1-1] ¶ 15. Plaintiffs allege federal claims under 42 U.S.C. § 1983 for violation of their Constitutional right to due process, equal protection,

2

and to be free from unlawful searches and seizures and under 18 U.S.C. § 1962(c), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as state law claims for false imprisonment, intentional infliction of emotional distress, and negligent infliction of emotional distress. *Id.* ¶¶ 179-239. Plaintiffs seek compensatory and punitive damages, as well as attorney's fees and costs. *Id.* at 44-45.

On May 21, 2013, the court by text order granted a motion to stay discovery and other pretrial proceedings pending resolution of the instant motions to dismiss and granted in part the motion to dismiss of the District Attorney's Office and Everhart, dismissing the District Attorney's Office after Plaintiffs conceded it was an entity not capable of being sued and dismissing the official capacity claims against Everhart after Plaintiffs conceded they were barred by sovereign immunity. *See* May 21, 2013 Text Order. Remaining at issue here are the civil RICO claim against Everhart in her individual capacity, the civil RICO claim against Murray, Newman, and Ingram, and all claims against the Sheriff's Department and the County.

## II. FACTUAL BACKGROUND

The facts taken in the light most favorable to Plaintiffs, *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969), are as follows. Plaintiff Andrew Gentile worked for the Ocean Isle Beach Police Department in Brunswick County, North Carolina from March 1995 until he retired in August 2008. Compl. ¶¶ 18, 23. In October 2008, he became a licensed private investigator and founded Coastal Carolina Private Investigative Services. *Id.* ¶ 24. As part of Gentile's work as a private investigator, he was retained by criminal defense attorneys to investigate charges filed against their clients in Brunswick County. *Id.* ¶ 25. Information discovered by Gentile, including violations of law enforcement policies and procedures, often led to the dismissal of charges, not guilty verdicts, or

3

other favorable outcomes for the defendants. *Id.* ¶¶ 26, 28.

In October 2008, Gentile was hired by attorney Richard Hollar ("Hollar") to investigate criminal charges against Hollar's client, Scott Forbes. *Id.* ¶ 29. Gentile uncovered exculpatory information regarding the alleged criminal activity and attempted to report his findings to Detective Donna Simpson ("Detective Simpson") of the Brunswick County Sheriff's Department, but Detective Simpson was unwilling to discuss the matter with Gentile. *Id.* ¶¶ 30, 32-33. Thereafter, Gentile filed a report with the New Hanover County Sheriff's Department. *Id.* ¶ 34. The matter was referred to the Brunswick County District Attorney's Office for prosecution and the case was assigned to Defendant Everhart, but was ultimately dismissed. *Id.* ¶¶ 36-37.

Gentile continued his work as a private investigator and, on several occasions was "harassed and impeded" by Everhart, including Everhart making false accusations to attorneys for whom Gentile provided investigative services. *Id.* ¶ 38. Specifically, on October 9, 2009 and February 10, 2010, Everhart communicated to attorneys Bob Griffith and Bonner Stiller, respectively, that Gentile misrepresented himself to be an investigator from the Brunswick County District Attorney's Office; and on July 15, 2010, Everhart communicated to attorney Joseph Causey that Gentile was trespassing and violating ethical standards. *Id.*

Gentile was hired again by Hollar to investigate criminal charges against another client, Kevin Yow, and to be an expert witness on law enforcement procedures at a trial to begin in February 2012. *Id.* ¶¶ 40, 48. This case was investigated by Sheriff's Department Detectives Lori Watson and Candy West and was prosecuted by Everhart. *Id.* ¶¶ 44, 48. In the course of discovery, Everhart and John David ("David"), the Brunswick County District Attorney, subpoenaed Gentile's personnel file from the Ocean Isle Beach Police Department and produced it to Hollar in discovery.

4

*Id.* ¶ 50. The subpoena was served by David Crocker ("Crocker"), an investigator for the District Attorney's Office. *Id.* ¶ 51. The file contained a letter dated April 7, 2009, from Detective Simpson to her supervisor at the Sheriff's Department, detailing an incident between her and Gentile during which Detective Simpson claimed that Gentile attempted to trade information he had obtained in the Scott Forbes case for any information the Sheriff's Department had discovered in its investigation of the Scott Forbes case. *Id.* ¶¶ 53-55. Gentile was unaware of this letter's existence or purpose in his personnel file. *Id.* ¶ 58. Gentile made an inquiry regarding the letter to the Ocean Isle Beach Police Department and was informed the letter was not part of the personnel file it produced in response to the subpoena. *Id.* ¶ 59. Gentile concluded that David, Everhart, Crocker, and/or Detective Simpson colluded to plant the letter in Gentile's personnel file after the file was received from the Ocean Isle Beach Police Department and prior to producing the file to Hollar in order to discredit Gentile, resulting in damage to Gentile's credibility and reputation. *Id.* ¶¶ 61-62.

On February 21, 2012, Gentile arrived at the Brunswick County Courthouse carrying thousands of documents and exhibits he had prepared as a witness for the Kevin Yow trial. *Id.* ¶ 64. A deputy informed Gentile that it had been ordered "from the top" that all private investigators be searched prior to entering the courthouse, and Gentile and his effects were thoroughly searched over his objection. *Id.* Another deputy later ordered Gentile to move his car from the courthouse parking lot where Gentile believed he was authorized to park. *Id.* ¶ 65. Gentile had never before been stopped and searched at the Brunswick County Courthouse or ordered to remove his car from the courthouse parking lot. *Id.* ¶ 66. On February 22 and 23, 2012, Gentile was searched again upon entering the courthouse, and Hollar requested a conference with the presiding judge and Everhart to address the searches and harassment of Gentile. *Id.* ¶¶ 67-68. During the conference, Everhart

5

defended the searches and the judge stated she would address the situation. *Id.* ¶¶ 70-71. Gentile was not searched again for the remainder of the three-week trial. *Id.* ¶ 71.

On May 26, 2012, Gentile was stopped at a Sheriff's Department checkpoint while driving his work van, which contained only two seatbelts. *Id.* ¶ 73. Deputy Rogers "berated" Gentile because there were three passengers (Gentile, his wife, and thirteen-year-old son), but only two seatbelts. *Id.* ¶¶ 73-74. Gentile was ordered to remain at the checkpoint, but after an "extended period of time" exited his vehicle to determine if he was free to leave and was ordered back to his vehicle until further notice. *Id.* ¶ 76. Deputy Rogers eventually returned and ordered Gentile's wife and son to exit the vehicle and issued Gentile a citation for failure of his passenger to wear a seatbelt. *Id.* ¶ 77. The citation was ultimately dismissed by the District Attorney's Office. *Id.*

On November 24, 2012, Deputy Rogers pulled over Gentile as he arrived at a local bar to serve a document and informed Gentile that he was pulled over because his vehicle had similar taillights to a vehicle that had avoided a checkpoint. *Id.* ¶¶ 78-79. Shortly thereafter, another deputy arrived and accused Gentile of drinking, demanding Gentile submit to a portable breath test. *Id.* ¶ 81. Gentile complied and was released. *Id.* ¶ 83. As a result of this incident, Gentile wrote a letter to the Sheriff's Department's Internal Affairs expressing concern regarding the "frivolous and potentially targeted" stop. *Id.* ¶ 86. Gentile was notified by Internal Affairs that the incident was reviewed, but no further action was taken. *Id.* ¶ 89.

Plaintiff Chrissy Gentile is the owner and operator of the Redgator Pawnshop (the "Redgator") in Ocean Isle Beach, North Carolina. *Id.* ¶ 90. Andrew Gentile assists his wife in the operation of the Redgator from time to time. *Id.* ¶ 93. The Gentiles have exercised "considerable caution" in receiving items at the Redgator to avoid fraudulent transactions or purchasing stolen

6

property, and the Redgator has had only seven transactions out of more than 3000 since 2006 involving fraudulently obtained or stolen items. *Id.* ¶¶ 94-95.

On August 22, 2012, Amber Holden ("Holden") sold three rings (a bridal set and one unrelated ring) to the Redgator. *Id.* ¶ 100. Chrissy Gentile assisted Holden with the transaction and Andrew Gentile was not present. *Id.* Holden had previously sold a marble globe and set of silver flatware to the Redgator on August 9, 2012, and August 10, 2012, respectively. *Id.* ¶ 101. On August 23, 2012, Regina Jenkins ("Jenkins") came to the Redgator inquiring as to whether her son Austin, who had been previously banned from the Redgator for selling items belonging to Jenkins without her authorization, had been there to pawn any items. *Id.* ¶¶ 98, 102. Andrew Gentile was present and informed Jenkins that Austin was not permitted in the Redgator; Jenkins then inquired as to whether Holden had been in the shop. *Id.* ¶ 103. The Gentiles indicated they could not disclose whether Holden had pawned items in the Redgator, but that Jenkins should file a police report if she believed her items had been stolen and sold. *Id.* ¶ 104.

On August 25, 2012, Detectives Ryan Newman and Michael Murray came to the Redgator with a police report filed by Jenkins, containing a description of two rings that had been stolen from her, which did not match the rings sold by Holden to the Redgator. *Id.* ¶¶ 105-06. Detectives Newman and Murray demanded to photograph the rings sold by Holden, despite the fact that the description did not match, and requested that the rings be held until further notice. *Id.* ¶¶ 107-08.

On September 3, 2012, Deputy Matthews came to the Redgator and questioned the Gentiles about the marble globe pawned by Holden. *Id.* ¶ 109. Deputy Matthews attempted to confiscate the globe, but Andrew Gentile objected, because Matthews did not have the proper paperwork. *Id.* Later the same day, Detective Knox brought to the Redgator a police report describing the globe as

7

stolen and, after providing the Gentiles with paperwork indicating that Holden was charged with obtaining property by false pretenses, confiscated the globe. *Id.* ¶¶ 113-14. On September 4, 2012, Detective Newman returned to the Redgator and notified the Gentiles that Jenkins had positively identified the bridal set Holden pawned at Redgator and confiscated the rings. *Id.* ¶¶ 116-17. Holden was charged with several counts of obtaining property by false pretenses for defrauding the Redgator, as well as other pawn shops, and on October 12, 2012, Andrew Gentile received a letter from the District Attorney's Office regarding his rights as a victim related to the stolen items Holden sold to the Redgator. *Id.* ¶¶ 123-24.

On January 5, 2013, Jenkins returned to the Redgator and informed the Gentiles that Jenkins' son and another person had pawned at the Redgator additional items stolen from Jenkins. *Id.* ¶ 127. Jenkins did not want to involve the police and, at Jenkins' request, the Gentiles agreed that the stolen items could be repurchased on a payment plan. *Id.* ¶ 128. On January 7, 2013, Detective Murray obtained a search warrant for the Redgator on grounds that it was violating state law regulating pawnbrokers and that Andrew Gentile knowingly engaged in a transaction involving stolen items. *Id.* ¶ 129. Detective Murray also obtained an arrest warrant for Andrew Gentile for misdemeanor receipt of stolen goods based on the transaction involving Holden's sale of the bridal ring set to the Redgator. *Id.* ¶ 131.

On January 8, 2013, Detectives Murray and Newman, along with more than ten other officers from various Brunswick County law enforcement agencies, including the Sheriff's Department, arrived at the Redgator to execute the search and arrest warrants. *Id.* ¶ 132. Officers searched the Redgator for eight hours, examining thousands of documents and requesting that Chrissy Gentile identify every item described on each pawn ticket. *Id.* ¶¶ 142-43, 146. Chrissy Gentile asked to

8

leave and her request was denied. *Id.* ¶ 144. Officers confiscated several items, including a modified AR-15 rifle, a .38 caliber revolver, and records required to be kept by ATF, providing no basis for taking these items. *Id.* ¶¶ 147, 149. Chrissy Gentile was informed the ATF would contact her the next day, but she was never contacted by ATF. *Id.* ¶ 148. Although Holden and Jenkins' son admitted selling stolen property to another pawn shop, no warrants were issued for that business or its owners. *Id.* ¶¶ 151-52. Holden later told a private investigator that Detective Newman told her he was out for "the guy at [the Redgator]" and that he would help reduce her sentence if she assisted Newman to "bring down" Andrew Gentile. *Id.* ¶ 170.

At the time of the search, Andrew Gentile was arrested, handcuffed, and transported to the Brunswick County Jail. *Id.* ¶ 153. Gentile informed the officers that he was experiencing pain and numbness in his right hand and wrist due to the handcuff being too tight, but his complaints were ignored. *Id.* ¶ 154. Gentile was further denied requested medical treatment for his injured wrist upon arrival at the jail and was repeatedly denied treatment until later when a nurse brought Gentile an ice pack. *Id.* ¶¶ 155, 161-62. Gentile was placed in a holding cell and officers refused to serve the arrest warrant on Gentile, even after Hollar arrived to speak with Gentile. *Id.* ¶¶ 157-59. After spending more than four hours in custody, Gentile was served with the arrest warrant and immediately taken to the Magistrate and released on unsecured bond. *Id.* ¶¶ 164-65. After release, Gentile sought medical treatment for his wrist. *Id.* ¶ 166. An x-ray revealed his wrist was sprained, and he was prescribed medication for pain and inflammation. *Id.* ¶ 167.

As a result of the events of January 8, 2013, the Gentiles have suffered "considerable mental, emotional and physical distress," including but not limited to severe anxiety and paranoia, sleeplessness, depression, and loss of appetite. *Id.* ¶¶ 171, 173-75. Andrew Gentile has also been

9

diagnosed with post-traumatic stress disorder, for which he receives mental health treatment and medication, and with a "crushing" injury with possible nerve damage to his wrist, pain, numbness, and a loss of strength in his wrist and hand. *Id.* ¶¶ 172, 174. The Gentiles have suffered damage to their reputation in the community, which has resulted in a loss of business for the Redgator, and Andrew Gentile is "nearly unemployable" as a private investigator. *Id.* ¶¶ 176-77.

## III.  STANDARD OF REVIEW

### A.  Rule 12(b)(1)

Pursuant to Rule 12(b)(1), a court must dismiss all or part of an action over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Whether subject matter jurisdiction exists is a threshold question that must be addressed by the court before considering the merits of the case. *Jones v. Am. Postal Workers Union,* 192 F.3d 417, 422 (4th Cir. 1999). The plaintiff, as the party opposing a Rule 12(b)(1) motion to dismiss, has the burden of proving that subject matter jurisdiction does, in fact, exist. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir. 1991).

### B.  Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a court may dismiss an action which fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). A 12(b)(6) motion to dismiss tests the sufficiency of the facts pleaded in the complaint and the relevant inquiry is whether the plaintiff's factual allegations are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). In reviewing a motion to dismiss, a court is required to consider the complaint in the light most favorable to the plaintiff and to accept as true all well-pleaded factual allegations. *Randall v. United States,* 30 F.3d 518, 522 (4th Cir. 1994).

10

The pleading standard set forth in Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," and a complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570); *see also Robinson v. Am. Honda Motor Co., Inc.*, 551 F.3d 218, 222 (4th Cir. 2009). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Thus, while "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555).

"The sufficiency of a civil RICO claim is judged in accordance with the notice pleading requirement of Rule 8(a)." *TM, LLC v. Anderson*, No. 2:11-CV-00071-FL, 2012 WL 4483180, at *2 (E.D.N.C. Sept. 27, 2012). "At the same time, however, 'where RICO claims are based on predicate acts of fraud, the heightened pleading standard set forth in Rule 9(b) of the Federal Rules of Civil Procedure applies.'" *Id.* (quoting *Field v. GMAC, LLC*, 660 F. Supp. 2d 679, 686 (D. Md. 2011) (citing *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989))). The heightened pleading standard of Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## IV.   ANALYSIS

### A.   Motion to Dismiss of Defendants Everhart and the District Attorney's Office [DE-15]

The District Attorney's Office and Everhart contend that they are immune from suit. Defs.' Mem. [DE-16] at 3-5. On May 21, 2013, the court by text order dismissed the District Attorney's

11

Office after Plaintiffs conceded it was an entity not capable of being sued and dismissed the official capacity claims against Everhart after Plaintiffs conceded they were barred by sovereign immunity. *See* May 21, 2013 Text Order. Accordingly, the only remaining claim at issue in the instant motion to dismiss is Plaintiffs' civil RICO claim against Everhart in her individual capacity. Everhart contends this claim must be dismissed for a variety of reasons: first, that Plaintiffs make no allegations that could be construed as actions allegedly taken outside of Everhart's official duties and, therefore, the Eleventh Amendment and common law sovereign immunity bars all claims, Defs.' Mem. [DE-16] at 4; next, that absolute prosecutorial immunity bars Plaintiffs' individual capacity claims, *id.* at 4-5, 10-16; and finally, that Plaintiffs have pled only conclusory allegations lacking plausibility and insufficient to withstand a motion to dismiss, *id.* at 5-8.

### 1. Sovereign Immunity

Everhart first contends that Plaintiffs make no allegations that could be construed as actions allegedly taken outside of Everhart's official duties and, therefore, the Eleventh Amendment and common law sovereign immunity bars the individual capacity claims against Everhart. Defs.' Mem. [DE-16] at 4. The Supreme Court has held that the Eleventh Amendment does not bar suits in federal court seeking to impose personal liability on individual state officials. *Hafer v. Melo*, 502 U.S. 21, 30 (1991). Defendants point out that Plaintiffs twice allege that Everhart "at all times relevant to this action, was employed by Defendant Brunswick County District Attorney's Office as an assistant district attorney." Defs.' Mem. [DE-16] at 4 (citing Compl. ¶¶ 13, 201). However, it is clear from the complaint that Plaintiffs have sued Everhart in both her official and individual capacities, *see* Compl. ¶ 13, and the fact that Plaintiffs allege Everhart was employed by the District Attorney's Office at the time of her alleged wrongful conduct does not, in and of itself, preclude an

12

individual capacity suit. Accordingly, sovereign immunity does not bar Plaintiffs' individual capacity claims against Everhart.[1]

## 2. Prosecutorial Immunity

Everhart contends that absolute prosecutorial immunity bars Plaintiffs' individual capacity claims. Defs.' Mem. [DE-16] at 4-5, 10-16. Specifically, Everhart contends that her alleged conduct concerned criminal cases and took place either in the District Attorney's Office or in court and related to her efforts to acquire evidence in pending cases and to handle discovery issues. *Id.* at 10-11. Prosecutors are absolutely immune from liability when carrying out "prosecutorial functions," which are those activities "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976); *see also Brunson v. N.C. Dep't of Soc. Servs.*, No. 5:09-CT-3063-FL, 2010 WL 3239030, at \*3 (E.D.N.C. Aug. 13, 2010) ("The line between prosecutorial functions, which are protected by absolute immunity, and investigative functions, which are protected by only qualified immunity, is drawn at the point of probable cause.") (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273-74 (1993)). This is so despite the harsh result of the application of absolute immunity in certain situations. *See Brunson*, 2010 WL 3239030, at \*2 ("To be sure, this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty. But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest.") (quoting *Imbler*, 424 U.S. at 427). The Supreme Court has been "quite sparing" in recognizing absolute immunity and has "refused to extend it any further than its justification would warrant." *Burns v. Reed*, 500

---

[1] While qualified immunity may bar an individual capacity claim, *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982), Everhart has not raised the affirmative defense of qualified immunity in her motion to dismiss and, therefore, it is not considered here.

13

U.S. 478, 487 (1991) (citations and internal quotation marks omitted). Furthermore, there is a presumption that qualified rather than absolute immunity is appropriate. *Id.* at 486-87; *Goldstein v. Moatz*, 364 F.3d 205, 212 (4th Cir. 2004).

The *Imbler* court recognized a number of considerations supporting absolute prosecutorial immunity, including "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties"; "the possibility that [the prosecutor] would shade his decisions instead of exercising the independence of judgment required by his public trust"; "a virtual retrial of the criminal offense in a new forum, and the resolution of some technical issues by the lay jury"; and the risk that in post-conviction proceedings the focus of the reviewing judge or tribunal may be "blurred by even the subconscious knowledge that a post-trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for his error or mistaken judgment." 424 U.S. at 422-27. This case is distinguishable from *Imbler*, and other typical prosecutorial immunity cases, because the Plaintiffs here were not investigated or prosecuted by Everhart. *See Imbler*, 424 U.S. at 421 ("The function of a prosecutor that most often invites a common-law tort action is his decision to initiate a prosecution, as this may lead to a suit for malicious prosecution if the State's case misfires.").

The gravamen of Plaintiffs' complaint with respect to Everhart is that she attempted to professionally discredit Andrew Gentile and destroy his private investigating business (1) by planting a disparaging letter in Gentile's personnel file, which was subsequently produced in discovery in the Kevin Yow case to Hollar; (2) by making knowingly false accusations of improper and unethical conduct regarding Gentile to his attorney clients; and (3) by encouraging and/or condoning the harassment of Gentile by unwarranted searches at the Brunswick County Courthouse.

14

Compl. ¶¶ 38, 50-70, 202-06. The fact that these alleged acts occurred in the context of a criminal prosecution does not *necessarily* mean the acts were prosecutorial functions and, under the facts and circumstances presented here, the considerations supporting prosecutorial immunity do not appear to be implicated. *See Odd v. Malone*, 538 F.3d 202, 213, 215 (3d Cir. 2008) (finding no absolute immunity for prosecutors' failures to inform court regarding custody status of detained witnesses where prosecutors' acts were considered administrative and not "intimately associated with the judicial phase of litigation" and policy considerations supporting absolute prosecutorial immunity were absent).

In the present case, Andrew Gentile was not prosecuted by Everhart, but rather was a witness and investigator for criminal defendants in cases prosecuted by Everhart; Plaintiffs allege against Everhart a claim under civil RICO, from which there is no common law tradition of immunity for prosecutors; and because Gentile was not a criminal defendant, he has no other forum, such as an appeal or other post-conviction proceeding, through which to vindicate his rights. Furthermore, taking the facts as alleged in the light most favorable to the Plaintiffs, Everhart's alleged actions had little to do with the prosecution of any particular case and were aimed at generally tainting Gentile's reputation as an investigator. Accordingly, considering the facts and circumstances alleged in the complaint in light of the policy considerations supporting immunity as set forth in *Imbler*, it appears Everhart has failed to show at this stage in the case that she is entitled to absolute prosecutorial immunity. However, this issue need not be decided here because, as explained below, Plaintiffs have failed to state a civil RICO claim against Everhart.

## 3.    Failure to State a Civil RICO Claim

Everhart contends that Plaintiffs have pled only conclusory allegations lacking plausibility

15

and have failed to state a civil RICO claim. Defs.' Mem. [DE-16] at 5-8; Defs.' Reply [DE-34] at 4-6. Section 1962(c) makes it a crime for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." To that end, Plaintiffs allege that Everhart has committed the illegal acts of wire and mail fraud, witness and victim tampering, obstruction of justice, and "other predicate acts" enumerated in 18 U.S.C. § 1961(1)(A) and (B). Compl. ¶¶ 202-03.

RICO "does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *US Airline Pilots Ass'n v. AWAPPA, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (quoting *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006)). The penalties authorized under RICO have been described as "drastic," and serve to underscore that RICO is "primarily designed to provide society with a powerful response to the dangers of organized crime." *Id.* (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 233, 245 (1989)). As the Fourth Circuit has emphasized, caution must be exercised

> to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted.

*Id.* (quoting *Menasco*, 886 F.2d at 683).

To state a civil RICO claim under § 1962(c), a plaintiff must allege (1) a person, (2) an enterprise, and (3) a pattern (4) of racketeering activity (5) that causes injury to the plaintiffs. *Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985). A plaintiff must also allege an injury to his or her business or property as a result of such conduct. *Id.*

16

### i. Person and Enterprise

To establish liability under § 1962(c), a plaintiff must allege "the existence of two distinct entities: (1) a "person"; and (2) an "enterprise" that is not simply the same "person" referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). "This 'distinctiveness' requirement is satisfied where the alleged 'person' is a corporate owner/employee of the alleged 'enterprise.'" *Barefoot v. Sec. Credit Corp.*, No. 5:08-CV-00018-BO, 2008 WL 4889334, at *3 (E.D.N.C. Nov. 12, 2008) (citing *King*, 533 U.S. at 163). The RICO statute defines an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

Here, Plaintiffs identify the District Attorney's Office as the enterprise and Everhart as the person employed by and participating in the RICO enterprise. Everhart disputes that the District Attorney's Office can be an "enterprise" for purposes of RICO, because it is a governmental agency and a district attorney is an elected state officer. Defs.' Reply [DE-34] at 4-5. The Fourth Circuit has declined to distinguish between public and private entities for purposes of satisfying the RICO "enterprise" requirement, specifically holding that a county prosecutor's office can be a RICO enterprise. *United States v. Altomare*, 625 F.2d 5, 7 (4th Cir. 1980) (citing *United States v. Baker*, 617 F.2d 1060, 1061 (4th Cir. 1980) (holding that a sheriff's department can be a RICO "enterprise")). Accordingly, Plaintiffs have sufficiently alleged a "person" and "enterprise" in their complaint.

### ii. Predicate Acts of Racketeering

Plaintiffs next must sufficiently allege a pattern of racketeering activity. Section 1961(1) lists

17

the predicate acts that may constitute racketeering activity, and the plaintiff must prove each prong of the predicate offense to establish the racketeering activity element of civil RICO. Here, Plaintiffs allege Everhart committed predicate acts of mail and wire fraud by making false statements regarding Andrew Gentile to his clients and planting a letter in Gentile's personnel file then producing the file to Gentile's client in discovery; witness and victim tampering by instigating or condoning harassment and searches of Gentile when he appeared at the courthouse to testify as a witness; altering a document or record by planting a letter in Gentile's personnel file then producing the file to Gentile's client in discovery; and obstruction of justice and criminal investigations by presumably the same conduct alleged to constitute the aforementioned predicate acts. Compl. ¶¶ 38, 49-70, 202-03.

With respect to the predicate acts of witness and victim tampering and altering a document or record, Plaintiffs rely on 18 U.S.C. § 1512, which prohibits these acts in connection with "an official proceeding." 18 U.S.C. § 1512(b)(1)-(2), (c)(1)-(2). For purposes of § 1512, an "official proceeding" means a federal proceeding, *e.g.*, a proceeding before a judge or court of the United States, Congress, or a federal agency. 18 U.S.C. § 1515(a)(1)(A)-(D); *see Davit v. Davit*, 366 F. Supp. 2d 641, 656 (N.D. Ill. 2004) (finding 18 U.S.C. § 1512 relates to federal investigations, agents, and proceedings). The complaint here contains no allegation of conduct related to a federal proceeding. Accordingly, Plaintiffs have failed to sufficiently allege predicate acts related to witness and victim tampering and altering a document or record.

With respect to the alleged predicate acts of obstruction of justice and criminal investigations, Plaintiffs do not specify the statute upon which they rely. Having reviewed the predicate acts listed in 18 U.S.C. § 1961(1) related to obstruction of justice, 18 U.S.C. §§ 1503, 1510-1513, none appears

18

applicable to Everhart's alleged conduct: § 1503 prohibits wrongful conduct against federal officers and jurors, § 1510 prohibits obstruction by means of bribery related to investigations of federal crimes, § 1511 prohibits obstruction of State or local law enforcement with the intent to facilitate an illegal gambling business, and §§ 1512 and 1513 prohibit conduct related to federal proceedings. *See Clayton v. Stephens*, 6 F. Supp. 2d 480, 486 (E.D.N.C. 1996) (finding alleged predicate acts of obstruction of justice deficient where the conduct related to state proceedings). Accordingly, Plaintiffs have failed to sufficiently allege predicate acts of obstruction of justice and criminal investigations.

The only remaining predicate acts alleged by Plaintiffs with respect to Everhart are mail and wire fraud. Even assuming Plaintiffs have sufficiently alleged predicate acts of mail and wire fraud,[2] these acts fail to satisfy the pattern requirement, as discussed in detail below.

### iii. Pattern of Racketeering Activity

The requisite "pattern of racketeering" must include "at least two [predicate] acts of racketeering activity . . . ." 18 U.S.C. § 1961(5). However, the establishment of "two isolated acts of racketeering activity do not constitute a pattern." *Sedima*, 473 U.S. at 496 n.14. Rather, "'it is the factor of *continuity plus relationship* which combines to produce a pattern.'" *Id.* (quoting S. Rep. No. 91-617, 91st Cong., 1st Sess. 158 (1969)). The pattern requirement is important because "[i]n

---

[2] With respect to the three allegedly false communications Everhart made to Gentile's clients, it appears that Plaintiffs have not, in fact, sufficiently pled mail or wire fraud, because Plaintiffs failed to plead the means by which these communications were made. Compl. ¶ 38. Thus, it is left to speculation whether these communications are alleged to have occurred by mail or wire. *See Vuyyuru v. Jadhav*, No. 3:10-CV-173, 2011 WL 1483725, at *20 (E.D. Va. Apr. 19, 2011) ("Proving mail and wire fraud requires a plaintiff to plead (1) a scheme disclosing an intent to defraud, and (2) *the use of the mails or interstate wires* in furtherance of the scheme.") (emphasis added) (citing *Am. Chiropractic v. Trigon Healthcare*, 367 F.3d 212, 233 (4th Cir. 2004)), *aff'd*, 501 F. App'x 294 (4th Cir. 2012). However, as explained below, even in the event the court would find that the allegations with respect to this conduct sufficiently plead mail or wire fraud, Plaintiffs' civil RICO claim against Everhart still fails because the requisite pattern is lacking.

providing a remedy of treble damages . . . Congress contemplated that only a party engaging in widespread fraud would be subject to such serious consequences." *Menasco*, 886 F.2d at 683 (citing S. Rep. No. 91-617, 91st Cong., 1st Sess. 158 (1969)).

Predicate acts are "related" if they have "'the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Menasco*, 886 F.2d at 683 (citing *H.J. Inc.*, 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e))). As for the continuity requirement, it "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241 (citation omitted). Closed-ended continuity may be established by "proving a series of related predicates extending over a substantial period of time." *Id.* at 242. "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* Moreover, "where the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time." *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1267 (11th Cir. 2004) (collecting cases); *see also Menasco*, 886 F.2d at 684 (finding plaintiffs' allegations failed to satisfy the continuity prong where the defendants' actions targeted one set of victims, were narrowly directed towards a single fraudulent goal and took place over approximately one year).

The predicate acts of mail and wire fraud are alleged to have occurred between October 9, 2009, and July 15, 2010, when the alleged false communications occurred between Everhart and Gentile's clients, and sometime between April 7, 2009 and February 20, 2012, when the alleged

20

letter planting scheme occurred.[3] Compl. ¶¶ 38, 48-63. Three communications occurring over nine months is not sufficiently "substantial." *See H.J. Inc.*, 492 U.S. at 242 ("Congress was concerned in RICO with long-term criminal conduct."). The additional consideration of the letter planting scheme, even if it occurred later in time than the alleged false communications, is insufficient to establish closed-ended continuity where the pleadings portray a single scheme perpetrated by Everhart and targeting a single victim, Andrew Gentile.[4] *See N.C. Supported Emp't v. N.C. Dep't of Health & Human Servs.*, No. 5:10-CV-135-FL, 2010 WL 4696556, at \*4 n.3 (E.D.N.C. Nov. 12, 2010) (concluding "allegations do not support an inference of closed continuity because the allegations involve 'a single scheme perpetrated . . . against a single victim.'") (quoting *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988)). While a singe scheme can be sufficient to sustain a RICO claim, considering the unity and narrow focus of the alleged conduct here, the present case "does not resemble the sort of extended, widespread, or particularly dangerous pattern of racketeering which Congress intended to combat with federal penalties." *Flip Mortg. Corp.*, 841 F.2d at 538 (citation omitted); *see also Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (demonstrating caution when " basing a RICO claim on predicate acts of mail and wire fraud because '[i]t will be the unusual fraud that does not enlist the mails and wires in its service at least twice.'") (citations omitted).

Furthermore, "[a] plaintiff cannot demonstrate open-ended continuity if the racketeering

---

[3] It is not entirely clear when Everhart is alleged to have planted the letter in Gentile's personnel file or when the file was produced to Hollar in discovery, which arguably fails to satisfy the heightened pleading standard of Rule 9(b). Presumably, these acts occurred after the letter was dated, April 7, 2009, and prior to the beginning of the Kevin Yow trial, February 20, 2012. Compl. ¶¶ 56, 63.

[4] There is no allegation linking Everhart with the actions of other Defendants related to Plaintiffs Chrissy Gentile or the Redgator.

21

activity has a 'built-in ending point, and the case does not present the necessary threat of long-term, continued criminal activity.'" *US Airline Pilots Ass'n*, 615 F.3d at 318-19 (quoting *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001) and citing *Menasco*, 886 F.2d at 684 (finding no continuity because "[d]efendants actions were narrowly tailored towards a single fraudulent goal"); *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 186 (2d Cir. 2008) (holding "a serious, but discrete and relatively short-lived scheme . . . insufficient to establish open-ended continuity" (internal quotation marks omitted)); *Gamboa*, 457 F.3d at 708 (holding that a "one-time endeavor to wreak havoc upon all matters linked to a single murder investigation" had a "built-in end point" and thus lacked continuity); *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000) ("Had Efron argued that the defendants planned to operate the hotel indefinitely at a paper loss as a means of perpetually defrauding him, rather than asserting the specific objective of squeezing him out of the Partnership, he would have a stronger argument for an open-ended RICO pattern. His pleadings and argument, however, depict an undertaking with a soon-to-be reached endpoint.")).

Plaintiffs allege in the complaint that Everhart's actions were taken for the purpose of destroying Andrew Gentile's reputation and credibility so that Gentile could no longer work as a private investigator. Compl. ¶¶ 202-06. Everhart's alleged objective, therefore, creates a foreseeable "built-in ending point"–destroying Gentile's private investigating business–that precludes a finding of open-ended continuity. *See N.C. Supported Emp't*, 2010 WL 4696556, at \*4 n.3 (concluding "allegations also did not support an inference of open continuity because the demise of [plaintiff] acts as a 'built-in ending point' that is 'closely related to the [alleged predicate act].'") (quoting *US Airline Pilots*, 615 F.3d at 319). There are no allegations that would indicate that this was part of

22

Everhart's regular way of doing business, and Plaintiffs' allegation that Andrew Gentile "has worked on dozens of cases as a private investigator and, upon information and belief, ADA Everhart was the only employee of the [District Attorney's Office] to ever accuse Mr. Gentile of any type of misconduct during his investigations" weighs against a finding that such conduct was regular practice at the District Attorney's Office. Compl. ¶ 39. Finally, the fact that the last alleged predicate act by Everhart occurred, at the latest, more than one year prior to the filing of the complaint, weighs against a finding of threatened future conduct. *See Whitney, Bradley & Brown, Inc. v. Kammermann*, No. 01:09-CV-596, 2010 WL 2696648, at \*4 (E.D. Va. July 7, 2010) ("Courts have refused to find open ended continuity where the racketeering activity was not actually continuing when the court considered the defendant's motion to dismiss.") (citing *McMahon v. Spano*, No. CIV. A. 96-3957, 1996 WL 627590, at \*3 (E.D. Pa. Oct. 29, 1996) (finding no open-ended continuity where a year has passed since defendants' most recent alleged racketeering activities)), *aff'd*, 436 F. App'x 257 (4th Cir. 2011).

Accordingly, Plaintiffs having failed to allege sufficient facts to show a pattern of racketeering activity, it is recommended that Everhart's motion to dismiss [DE-15] be granted and that Plaintiffs' RICO claim against Everhart be dismissed for failure to state a claim.

## B. Motion to Dismiss of the Sheriff's Department and the County [DE-20]

### 1. The Sheriff's Department

The Sheriff's Department contends that it should be dismissed from this action because it lacks the capacity to be sued. Defs.' Mem. [DE-21] at 2-7. Plaintiffs concede that the Sheriff's Department is not an entity capable of being sued and consent to dismissal of the Sheriff's Department as a party in this matter. Pls.' Mem. [DE-40] at 3. Accordingly, it is recommended that

23

the Sheriff's Department be dismissed from this action.

## 2. The County

The County contends that it should be dismissed from this action because it cannot be liable for the acts or omissions of the Sheriff or his officers. *Id.* at 3-5. "[A] local government is liable under § 1983 for its policies that cause constitutional torts." *McMillian v. Monroe Cnty.*, 520 U.S. 781, 784 (1997). However, "municipal liability under 42 U.S.C. § 1983 is limited to deprivations of federally protected rights caused by action taken 'pursuant to official municipal policy of some nature . . . .'" *Pembaur v. City of Cincinnati*, 475 U.S. 469, 471 (1986) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)). "[A] municipality cannot be held liable solely because it employs a tortfeasor–or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. "[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability" and "whether a particular official has 'final policymaking authority' is a question of state law." *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (citations omitted). The key inquiry in determining whether a county may be liable for a sheriff's actions is how state law allocates power and responsibility. *Knight v. Vernon*, 214 F.3d 544, 552 (4th Cir. 2000) (citing *McMillian*, 520 U.S. at 786).

There are numerous cases, both federal and state, recognizing that under North Carolina law "[t]he sheriff, not the county has final policymaking authority over personnel decisions in [the sheriff's] office." *See, e.g., Worrell v. Bedsole*, 110 F.3d 62, 1997 WL 153830, at *5 (4th Cir. Apr. 3, 1997) (citing *Clark v. Burke Cnty.*, 117 N.C. App. 85, 89, 450 S.E.2d 747, 749 (1994)). Likewise, "allegations relating to personnel, training, or other law enforcement policies at the county

24

jail fall within the sheriff's policymaking authority and are not attributable to the county." *Jones v. Harrison*, No. 4:12-CV-90-D, 2013 WL 1452861, at *2 (E.D.N.C. Apr. 9, 2013). However, this court has recognized that "[t]he one topic pertaining to the county jail over which a county may exercise final policymaking authority deals with the medical care of jail inmates." *Id.* (citations omitted).

> By statute, each county that operates a jail "shall develop a plan for providing medical care for prisoners in the facility." N.C. Gen. Stat. § 153A-225(a). The county develops the medical care plan in conjunction with the sheriff and other local authorities, and the plan must be approved by the county's health director and governing board. *See id.* Moreover, in the event an inmate has a medical emergency, the county that operates the jail "shall pay the cost of emergency medical services." N.C. Gen. Stat. § 153A-224(b). Wake County argues that these statutory obligations terminate with respect to the county once a jail is constructed and its operation turned over to the sheriff. *See* Def.'s Mem. 9-10. The North Carolina Court of Appeals, however, has construed the statutes more expansively to "'require that a county provide emergency medical services to prisoners incarcerated in the county's jail and to pay for such services.'" *Cnty. of Guilford v. Nat'l Union Fire Ins. Co.*, 108 N.C. App. 1, 4, 422 S.E.2d 360, 362-63 (1992) (quoting *Univ. of N.C. v. Hill*, 96 N.C. App. 673, 675, 386 S.E.2d 755, 757, aff'd, 327 N.C. 465, 396 S.E.2d 323 (1990)) (emphasis omitted).

*Id.*; *see also Vaught v. Ingram*, No. 5:10-CT-3009-FL, 2011 WL 761482, at *3-4 (E.D.N.C. Feb. 24, 2011) (finding that "plaintiff's claim that Brunswick County failed to provide medical services and emergency medical care pursuant to § 153A-225 survives Brunswick County's motion to dismiss because § 153A-225(a) appears to impose statutory duties on the county for the provision of medical care and emergency medical care.") (citing *Ellis v. Bunn*, No. 7:08-CV-71-BR, 2008 WL 3876165, at *2-3 (E.D.N.C. Aug. 18, 2008) (declining to dismiss on a 12(b)(6) motion a § 1983 claim against the county based on N.C. Gen. Stat. § 153A-225)).

Plaintiffs maintain in their brief that the County is liable here to the extent policy-making authority was delegated by the County to the Sheriff and to the extent Plaintiffs' claims stem from

25

the Sheriff's actions as the policymaker for the Brunswick County Jail. Pls.' Mem. [DE-40] at 3-4. However, there are no allegations whatsoever in the complaint regarding this theory of liability against the County. In cases where this court has allowed such claims to proceed against a county, the basis for the county's liability was sufficiently alleged in the complaint. *See Jones*, 2013 WL 1452861, at *3 ("[P]laintiffs' complaint cites Wake County's duty under N.C. Gen. Stat. § 153A-225 to develop a medical care plan for inmates. Moreover, count one alleges, in part, that Wake County's plan was inadequate. These allegations in count one against Wake County are sufficient to survive the motion to dismiss.") (internal citations omitted); *Vaught*, No. 5:10-CT-03009-FL, Compl. [DE-1] ¶¶ 1, 10, 162 ("At all times alleged herein, the Detention Center was maintained by Brunswick County"; "Brunswick County is responsible for funding and maintaining an adequate jail facility for the county and is liable for the acts of the BCSO and its sheriff, deputies, agents and employees"; and "Southern Health provided services to [the inmate] pursuant to an agreement with Brunswick County to provide necessary health care services at the Detention Center."); *Ellis*, No. 7:08-CV-00071-BR, Compl. [DE-1-2] ¶¶ 4, 18, 53 ("Bladen County also is legally responsible for the harm caused by the actions of the jailers because Plaintiff believes that it failed to develop, adopt, and revise a medical plan for the proper administration of medical services at the Bladen County Jail in a manner that was sufficient te secure the medical needs of [the inmate]"; "Bladen County is responsible for funding and maintaining an adequate jail facility for Bladen County"; "Defendant Bladen County, at all times relevant hereto, owed a statutory and regulatory duty to [the inmate] pursuant to N.C. Gen. Stat. §§ 153A-224 and 225.").

Although Plaintiffs may have presented a viable theory of liability against the county in their response brief, a plaintiff may not amend the pleadings through briefing. *See Bratcher v. Pharm.*

26

*Prod. Dev., Inc.*, 545 F. Supp. 2d 533, 542 (E.D.N.C. 2008) (finding plaintiff "cannot use her brief to amend her complaint") (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."); *In re aaiPharma Inc. Sec. Litig.*, 521 F. Supp. 2d 507, 514 (E.D.N.C. 2007); *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, No. 07-1084, 2008 WL 238562, at *6 (4th Cir. Jan. 29, 2008) (unpublished) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." (internal quotation omitted))). Moreover, as the County points out in its reply, Plaintiffs' complaint fails to even state what claims are asserted against the County. Defs.' Reply [DE-42] at 3. Accordingly, because Plaintiffs have failed to make any allegations in the complaint in support of their theory of liability against the County, it is recommended that the County be dismissed for failure to state a claim.

## C.    Motion to Dismiss Civil RICO Claim Against Ingram, Newman, and Murray

Sheriff Ingram and Detectives Newman and Murray contend that Plaintiffs' have failed to adequately allege that these Defendants engaged in a pattern of racketeering activity. Defs.' Mem. [DE-38] at 3-12. As explained above in detail, *see supra* § IV.A.3.ii-iii, to state a civil RICO claim, Plaintiffs must sufficiently allege a pattern of racketeering activity, which requires a showing of "continuity plus relationship" with respect to two or more predicate acts. *Sedima*, 473 U.S. at 496.

### 1.    Predicate Acts of Racketeering

The predicate acts alleged with respect to Ingram, Newman, and Murray are mail and wire fraud, extortion, witness tampering and harassment, altering a document or record, and obstructing justice and criminal investigations. Compl. ¶ 210. Plaintiffs have failed to sufficiently allege predicate acts of witness tampering and harassment, altering a document or record, and obstructing

27

justice and criminal investigations for the same reasons stated with respect to these predicate acts as alleged against Defendant Everhart. *See supra* § IV.A.3.ii.

With respect to the alleged predicate act of extortion, Plaintiffs contend that the harassment of Andrew Gentile by the Sheriff's Department employees when he appeared at the courthouse to testify as a witness and the two traffic stops of Gentile were extortion within the meaning of North Carolina General Statute § 14-118.4.[5] Pls.' Mem. [DE-50] at 8-10. To sufficiently plead a violation of extortion under § 14-118.4, a plaintiff must allege that the defendant attempted to obtain the plaintiff's property, with plaintiff's consent, where such consent was induced by the wrongful use of actual or threatened force, violence or fear. *Barefoot v. Sec. Credit Corp., Inc.*, No. 5:08-CV-00018-BO, 2008 WL 4889334, at *5 (E.D.N.C. Nov. 12, 2008) (citing *Tryco Trucking Co. v. BelkStores Servs., Inc.*, 634 F. Supp. 1327, 1334 (W.D.N.C. 1986)); *see also Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union*, 585 F. Supp. 2d 789, 798 (E.D. Va. 2008) (explaining "for a 'state extortion offense' to qualify as a predicate act under the federal RICO statute, the conduct must be capable of being generically classified as extortionate: that is, 'obtaining something of value from another with his consent induced by the wrongful use of force, fear or threats'") (quoting *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409-10 (2003)) (emphasis

---

[5] In their response brief, Plaintiffs alternatively attempt to characterize the May 2012 checkpoint stop of Gentile by Sheriff's Deputies, related to the seat belt violation, as possibly wire fraud "to the extent wire communications, such as police radios, cell phones, or internet communications, were used in furtherance of this harassing activity by calling additional officers to the scene or by communicating with the officers on the scene while the deputy that ultimately issued the citation temporarily departed." Pls.' Mem. [DE-50] at 9-10. There are no allegations whatsoever in the complaint regarding wire communications with respect to the May 2012 stop. Compl. ¶¶ 73-77. Thus, Plaintiffs have failed to plead the requisite elements of wire fraud with respect to the May 2012 stop. *See Vuyyuru*, 2011 WL 1483725, at *20 ("Proving mail and wire fraud requires a plaintiff to plead (1) a scheme disclosing an intent to defraud, and (2) the use of the mails or interstate wires in furtherance of the scheme.") (citing *Am. Chiropractic*, 367 F.3d at 233).

Case 7:13-cv-00081-FL   Document 58   Filed 01/23/14   Page 28 of 32

omitted). Thus, even if a defendant interferes with a plaintiff's property rights, he cannot be held liable for extortion unless he receives something of value from the plaintiff. *Scheidler*, 537 U.S. at 404-05, 411 (holding "[b]ecause petitioners did not obtain or attempt to obtain respondents' property, both the state extortion claims and the claim of attempting or conspiring to commit state extortion were fatally flawed"); *see also United States v. Gotti*, 459 F.3d 296, 324 (2d Cir. 2006) (noting that mere interference with right to conduct business, even to point of causing cessation of business, is closer to coercion than extortion).

Here, Plaintiffs have failed to allege any conduct that could plausibly be interpreted extortionate–that defendants attempted to obtain property from Plaintiffs with Plaintiffs' consent. *See Scheidler*, 537 U.S. at 405 (explaining interfering with or depriving someone of property is insufficient to constitute extortion where no property is pursued or obtained from another); *see also N.C. Supported Emp't*, 2010 WL 4696556, at *4 (concluding, in case involving alleged scheme to force plaintiffs out of business, that plaintiffs failed to allege conduct that may be generally classified as "extortionate," and allegations did not support the inference that defendants attempted to obtain property by inducing plaintiffs' consent ). Accordingly, Plaintiffs have failed to sufficiently allege a predicate act of extortion.

The only remaining predicate acts alleged by Plaintiffs are mail and wire fraud based on Detective Simpson's drafting of the letter allegedly planted by Everhart and Detective Murray securing unfounded arrest and search warrants for Andrew Gentile and the Redgator, respectively. Even assuming that Plaintiffs have sufficiently alleged predicate acts of mail and wire fraud, these acts fail to satisfy the pattern requirement, as discussed in detail below.

29

## 2. Pattern of Racketeering Activity

There appear to be no allegations of mail and/or wire fraud with respect to Detective Newman, and the conduct alleged to be mail and/or wire fraud with respect to Detective Murray, obtaining unfounded arrest and search warrants, occurred on January 7, 2013. Compl. ¶¶ 129, 131. One isolated incident of obtaining two allegedly unfounded warrants—arguably insufficient to satisfy the requirement of two predicate acts—fails to satisfy the pattern requirement for purposes of RICO. *See Aversano v. Greenberg Traurig, LLP*, 753 F. Supp. 2d 1063, 1066 (C.D. Cal. 2010) ("If the predicate acts are isolated or sporadic incidents, they do not amount to a 'pattern of racketeering activity.'") (quoting *Durning v. Citibank Int'l*, 990 F.2d 1133, 1138 (9th Cir. 1993)). Accordingly, Plaintiffs have failed to sufficiently allege a pattern of racketeering activity against Newman and Murray.

Plaintiffs do not allege any direct conduct by Sheriff Ingram, but seek to attribute to Ingram the conduct of his employees, mostly occurring in January 2013.[6] Plaintiffs assert in their response that they are proceeding under an open-ended theory of continuity. Pls.' Mem. [DE-50] at 5. Plaintiffs argue that employees of the Sheriff's Department, including Sheriff Ingram and Detectives Newman and Murray, were threatened by Andrew Gentile's investigative work uncovering various alleged abuses by the Sheriff's Department and abused their positions as law enforcement officers to retaliate against him and ruin his reputation as a private investigator (also injuring the interests of Chrissy Gentile and the Redgator in the process). *Id.* at 6.

---

[6] Detective Simpson is alleged to have participated in the letter planting scheme, Compl. ¶ 61, but it is unclear precisely when this took place, which arguably fails to satisfy the heightened pleading requirements of Rule 9(b). Presumably, Detective Simpson's actions occurred sometime between April 7, 2009, when the letter was dated, *id.* ¶ 56, and February 20, 2012, when the Kevin Yow trial started, *id.* ¶ 63.

Plaintiffs' civil RICO claim against Ingram fails for the same reasons stated above with respect to the civil RICO claim against Everhart–the alleged racketeering activity has a built-in ending point and does not "project[] into the future with a threat of repetition." *See H.J. Inc.*, 492 U.S. at 241; *N.C. Supported Emp't*, 2010 WL 4696556, at \*4 n.3 (concluding "allegations also did not support an inference of open continuity because the demise of [plaintiff] acts as a 'built-in ending point' that is 'closely related to the [alleged predicate act].'") (quoting *US Airline Pilots*, 615 F.3d at 319). *See also Al-Abood*, 217 F.3d at 238 (urging caution when "basing a RICO claim on predicate acts of mail and wire fraud because '[i]t will be the unusual fraud that does not enlist the mails and wires in its service at least twice.'") (citations omitted). Furthermore, while Plaintiffs assert in their response brief that the alleged wrongful conduct "could be perpetrated against any victim for the same purposes and by the same methods as those present here," Pls.' Mem. [DE-50] at 5, the complaint is devoid of any allegation that would support such a far-reaching scheme. Finally, there are no allegations that would indicate that this was part of the regular way of doing business by Ingram or his employees. *See H.J. Inc.*, 492 U.S. at 243-44.

In sum, the alleged conduct regarding Detective Simpson's involvement in the letter planting scheme and Detective Murray obtaining allegedly unfounded arrest and search warrants on one occasion fails to establish the requisite pattern necessary to state a civil RICO claim. The bulk of the alleged conduct in the complaint does not establish a predicate act for purposes of RICO, leaving isolated predicate acts not indicative of the widespread fraud RICO was meant to address. Accordingly, it is recommended that Plaintiffs' civil RICO claim against Defendants Ingram, Newman, and Murray be dismissed for failure to state a claim.

31

## V. CONCLUSION

For the reasons stated herein, it is RECOMMENDED as follows:

(1) the motion to dismiss of the District Attorney's Office and Everhart [DE-15] be GRANTED;

(2) the motion to dismiss of the Sheriff's Office and the County be GRANTED [DE-20]; and

(3) the motion to dismiss the civil RICO claim against Ingram, Murray, and Newman [DE-37] be GRANTED.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

SUBMITTED, this the 22nd day of January 2014.

Robert B. Jones, Jr.
United States Magistrate Judge